## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| PACIFIC AGRI-PRODUCTS, INC., | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| JBS USA FOOD COMPANY HOLDINGS, JBS S.A., SWIFT BEEF COMPANY, JBS PACKERLAND, INC., TYSON FOODS, INC., TYSON FRESH MEATS, INC., CARGILL, INC., CARGILL MEAT SOLUTIONS CORPORATION, NATIONAL BEEF PACKING COMPANY, AND MARFRIG GLOBAL FOODS S.A. | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.     NATURE OF ACTION ................................................................................... 1

II.    JURISDICTION AND VENUE ...................................................................... 8

III.   PARTIES ........................................................................................................ 8

       A.    Plaintiff ............................................................................................... 8

       B.    Defendants ........................................................................................... 9

       C.    Co-Conspirators ................................................................................ 13

       D.    Unity of Purpose Between Tyson, JBS, and Cargill's Respective Parent and Subsidiary Companies ........................................................................ 14

IV.    TRADE AND COMMERCE ....................................................................... 24

       A.    Beef Distribution Chain..................................................................... 24

       B.    Structure of Beef Industry ................................................................. 26

             1.     The Beef Meatpacking Industry is Highly Concentrated ............... 27

             2.     The Meat-Packing Market Features High Barriers to Entry .......... 28

             3.     Beef is a Commodity Product ........................................................ 29

             4.     The Demand for Beef is Inelastic.................................................. 29

V.     VIOLATIONS ALLEGED ........................................................................... 30

       A.    Defendants Agreed to Reduce Slaughter Volumes ................................... 30

       B.    The Agreement Resulted in Significantly Reduced Slaughter Volumes by the Defendants during the Class Period .................................................... 34

       C.    Defendants Closed or Idled Plants, and Refrained from Expanding Capacity ................................................................................................ 36

       D.    Defendant Publicly Signaled Each Other to Keep Slaughter and Capacity Restrained ............................................................................................ 41

       E.    The Collusive Agreement to Reduce Resulted in an Increased Spread Between the Fed Cattle and Beef Prices .................................................. 44

    F.     Tyson and JBS Attribute Their Record 2017 & 2018 Profits to "Visibility" into the Beef Supply Chain...................................................................... 46

VI.   ADDITIONAL FACTORS SUPPORTING THE EXISTENCE OF DEFENDANTS' CONSPIRACY ........................................................................ 48

    A.     Defendants Took Advantage of Numerous Opportunities to Collude........ 48

    B.     The Defendants Supply Restraints Were Not Offset and Were Further Exacerbated by Reductions in Imports ...................................................... 51

VII.   ANTITRUST INJURY ...................................................................................... 52

VIII.   THE DEFENDANTS ACTIVELY CONCEALED THE CONSPIRACY ........... 56

    A.     Fraudulent Concealment............................................................................. 56

         1.     The Tyson Defendants.................................................................... 57

         2.     The JBS Defendants ....................................................................... 58

         3.     The Cargill Defendants................................................................... 59

         4.     National Beef ................................................................................. 60

    B.     Continuing Violations ................................................................................ 65

IX.   CLASS ACTION ALLEGATIONS .................................................................. 66

X.   VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) ...... 69

XI.   REQUEST FOR RELIEF .................................................................................. 71

XII.   JURY TRIAL DEMANDED .............................................................................. 72

Plaintiff Pacific Agri-Products, Inc., individually and on behalf of a class of all persons and entities that purchased Beef, as that product is defined herein, directly from JBS S.A., JBS USA Food Company Holdings, Swift Beef Company, JBS Packerland, Inc., Tyson Foods, Inc., Tyson Fresh Meats, Inc., Cargill, Inc., Cargill Meat Solutions Corporation (a/k/a Cargill Protein), National Beef Packing Company, and/or Marfrig Global Foods S.A. (collectively, the "Defendants") from at least as early as January 1, 2015 until the present (the "Class Period"), brings this action under the antitrust laws of the United States against Defendants, and demands a trial by jury.

## I.   NATURE OF ACTION

1.     This is an antitrust class action for injuries sustained to the business and property of Plaintiff and the members of the Plaintiff Class from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.     From at least as early as 2015 through the present, the Defendants entered into a combination, contract or conspiracy to fix, maintain and raise the price of Beef to supracompetitive levels. They engaged in their scheme using mechanisms that included suppressing throughput of fed cattle[1] thereby creating artificial Beef supply restraints. The conspiracy to suppress the throughput of fed cattle led to Beef prices paid by Plaintiff and direct purchaser class members being higher than they otherwise would have been in a competitive market.

---

[1]Fed cattle are steers and heifers raised and fed for the production and sale of high-quality beef products. Fed-cattle does not include culled cows, which are primary used for dairy production, and then at the end of their dairy producing life, are slaughtered for lower quality ground beef.

1

3.      Beef is meat from full-grown cattle that is approximately 2 years old. "Boxed beef" is a combination of cuts subject to USDA grading. Price is the primary competitive factor. "Beef" for purposes of this complaint is defined as "boxed beef" and case ready cuts, and does not include ground beef from culled cows.

4.      The four Defendant families are the largest meatpacking companies in the world and the leading processors of the approximately 26,868 million pounds of boxed beef produced in the U.S. in 2018.

5.      Defendants' scheme succeeded, in part, due to the structure of the Beef industry. The Defendants purchase fed cattle from farmers, process it into Beef, and sell the Beef to Plaintiff and other direct purchasers. Slaughter and packing are essential parts of the Beef supply chain.

6.      The Defendants account for over 80% of the Beef supplied to the wholesale market, thus collectively controlling a crucial component of the distribution chain. The meatpacking industry, therefore, is highly concentrated.  This high industry concentration affords the Defendants market power with respect to both upstream fed cattle purchases and downstream Beef sales. As the "big four" players in this highly concentrated industry, the Defendants interact frequently at industry events and trade association meetings, and their respective executives are well-acquainted. The market is therefore highly conducive to collusion. The existence of the Defendants' conspiracy is confirmed by at least one confidential witness account. A confidential witness previously employed by a Packing Defendant ("Witness 1"), has confirmed that each of the Defendants expressly agreed to reduce their respective purchase and slaughter volumes, which would have the effect of

artificially raising the price of Beef. Witness 1's account is corroborated by transactional data and slaughter volume records reported by Defendants and published by the United States Department of Agriculture ("USDA"), as well as Defendants' public calls for industry-wide slaughter and capacity reductions.

7.     Defendants engaged in periodic and parallel slaughter reductions throughout the Class Period. The impact of Defendants' respective slaughter reductions upon their annual slaughter volumes is illustrated in the below figure. This figure compares the average annual slaughter volume of the Defendants during the pre-Class Period and the portion of the Class Period for which data exists against that of the other US beef packers. It shows that Defendants all reduced their annual slaughter volumes relative to the pre-Class Period, while independent regional packing businesses ("Independent Packers") increased their slaughter volume.

**Average Pre- and Post-Class Period Fed Cattle Slaughter – Defendants vs. Smaller/Independents**



8.     The Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for Beef. As the supply of fed cattle is insensitive to short-term changes of price – owing to the long life cycle of fed cattle, their perishable nature, and their lack of any alternative use – and as Beef demand is relatively insensitive to changes in price, the meat margin is very sensitive to changes in aggregate industry slaughter levels. A collusive restraint on the volume of the purchase of fed cattle naturally creates an artificial restraint on the supply of Beef. This decrease in purchase and throughput has the effect of artificially suppressing the prices paid for fed cattle and artificially raising the price of Beef above the levels which would prevail in a freely competitive market. The Defendants, in this way, increased the meat

margin, and thus their profitability, by working cooperatively to reduce their respective slaughter volumes.

9.      The Beef market first saw a marked change in pricing practices in 2015. Before 2015, the prices of fed cattle and Beef moved in tandem: as one would expect, lower cattle prices usually led to correspondingly lower wholesale Beef prices. After 2015 when Defendants collusively cut production, however, this fundamental economic relationship was altered. Suddenly, the degree of correlation of cattle and Beef prices diverged to the benefit of the Defendants, and without credible explanation. The relevant supply and demand factors in the industry no longer explained the prices being seen by direct purchasers. Wholesale Beef prices showed unusual trends starting in 2015. The per pound price of cattle had historically stayed within 20 to 40 cents of the per pound wholesale price of Beef on average, but in 2015, the spread between those prices increased dramatically, as seen on the chart below.



| YEARS | FARM-TO-WHOLESALE PRICE SPREAD | PROPORTIONAL INCREASE |
|---|---|---|
| 2010 through 2014 | $34 | --- |
| 2015 through 2018 | $54 | 59% |
| January 2019 | $69 | 27% |

10.   There was a steep decline in the price of fed cattle starting in 2015 where meatpackers did not purchase as much of the farmers' fed cattle inventory. But wholesale and retail prices remained high relative to the price of fed cattle. This incongruous pricing trend continued into 2016: although cattle prices had fallen to pre-2014/2015 levels,

wholesale and retail Beef prices remained high relative to cattle prices. Defendants' burgeoning meatpacker cartel had realized that if no meatpacker "broke rank" to increase throughput of fed cattle to the unmet demand for beef, the "big four" could increase their profitability by achieving and maintaining unprecedented high wholesale prices relative to fed cattle prices.

11.    The Defendants' conspiracy and exercise of their market power in both the upstream and downstream markets allowed them to grow their operating margins steadily from 2015 through 2018. By the end of 2018, Tyson and JBS, the two publicly traded Beef packers, were reporting record operating margins in their beef business. That year, Tyson reported beef business operating margins of nearly 7 percent,[2] almost double its 2014 operating margins, and JBS reported beef business margins of 10.2 percent.[3] As industry reporter Cassandra Fish noted at the time, the Defendants "no longer compete[d]" and were enjoying "gangbuster profits."[4]

12.    Aside from the information provided by Witness 1, numerous "plus factors" support the inference of collusion by the meatpackers during the Class Period, including high barriers to entry, high industry consolidation and concentration, inelastic supply and demand, unusual market share stability, economic factors that are consistent with the existence of a horizontal conspiracy, a homogenous product, and ample opportunities to conspire.

---

[2] Tyson November 13, 2018 Q4 Earnings Call.
[3] JBS August 15, 2018 Q2 Earnings Call.
[4] Cassandra Fish, "Whatever Happened to a Fair Fight," The Beef (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/

13.     Because of Defendants' unlawful conduct, Plaintiff and the direct purchaser class paid artificially inflated prices for Beef during the Class Period, and Beef prices during the Class Period were greater than they otherwise would have been in a competitive market. Plaintiff and class members therefore suffered antitrust injury and injury to their business or property because of Defendants' illegal conduct.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

15.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants resides, is found, has an agent or transacted business in this District, and because a substantial portion of the affected interstate commerce was carried out in this District.

16.     The activities of the Defendants and all co-conspirators were within the flow of, were intended to, and had direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

## III.    PARTIES

### A.     Plaintiff

19.     Plaintiff Pacific Agri-Products, Inc. ("Pac-Agri") is a California company with its principal place of business in South San Francisco, California. Pac-Agri directly purchased beef that was processed and sold by one or more Defendants or their co-

conspirators during the Class Period. Pac-Agri suffered injury as a result of the antitrust violations alleged herein.

20.     Plaintiff Pac-Agri seeks to represent all persons and entities who, during the period from January 1, 2015 through present, or such time as the anticompetitive effects of Defendants' conduct ceased, purchased Beef directly from a Defendant or co-conspirator in the United States.

### B.     Defendants

#### 1.     The Cargill Defendants

21.     Cargill, Incorporated ("Cargill") is a privately held Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold Beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Cargill, Incorporated is the parent company of the Cargill group.

22.     Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) ("Cargill Meat"), a subsidiary of Cargill, is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202. Cargill Meat is the principal operating entity within Cargill's U.S. cattle and beef business and a wholly owned subsidiary of Cargill. On information and belief, Cargill Meat owns directly, or indirectly through its subsidiaries, Cargill's U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

23.     During the Class Period, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of the class in the United States and in this District.

24.     Defendants Cargill and Cargill Meat are referred to collectively herein as "Cargill."

### 2.     The JBS Defendants

25.     Defendant JBS S.A. is a Brazilian corporation with its principal place of business located at Av. Marginal Direta do Tiete, 500 Bloco 3-3o. andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil. JBS S.A. is the parent company of the JBS group.

26.     JBS USA Food Company Holdings ("JBS USA") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634. JBS USA is the principal operating entity of JBS's U.S. cattle/beef business. On information and belief, it is the principal operating entity within JBS's U.S. cattle and beef business, and the contracting entity for certain of JBS's purchases of fed cattle in the USA.

27.     Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley, Colorado 80634. Swift owns directly, or indirectly through its subsidiaries, certain of JBS's U.S. fed cattle slaughter plants including the Cactus, Texas; Greeley, Colorado; Grand Island, Nebraska; and Hyrum, Utah plants.

26.     Defendant JBS Packerland, Inc. ("JBS Packerland") is a Delaware corporation with its principal place of business located at 1770 Promontory Circle, Greeley,

Colorado 80634. On information and belief JBS Packerland owns directly, or indirectly through its subsidiaries, certain of JBS's U.S. fed and dairy cattle slaughter plants, including the Packerland packing plants in Green Bay, Wisconsin and Plainwell, Michigan; the Sun Land Beef plant in Tolleson, Arizona; and the Moyer Packing plant in Souderton, Pennsylvania.

27. Defendants JBS USA, Swift, and JBS Packerland were, throughout the Class Period, wholly owned, direct or indirect subsidiaries of JBS S.A.

28. Defendants JBS S.A., JBS USA, Swift, and JBS Packerland are referred to collectively herein as "JBS."

29. During the Class Period, JBS and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold Beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

30. During the Class Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of the class in the United States and in this District.

### 3. The Tyson Defendants

31. Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold Beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

32. Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh Meats") is a wholly owned

subsidiary of Tyson Foods. Tyson Fresh Meats is a Delaware corporation with its principal place of business located at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049. Tyson Fresh Meats is the principal operating entity within Tyson's U.S. cattle and beef business. On information and belief, Tyson Fresh Meats owns directly, or indirectly through its subsidiaries, Tyson's U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

33.     During the Class Period, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from members of the class in the United States and in this District.

34.     Defendants Tyson Foods and Tyson Fresh Meats are referred to collectively herein as "Tyson."

### 4.     The National Beef Defendants

35.     National Beef Packing Company ("National Beef") is a privately-owned Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163. National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold Beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. On information and belief, National Beef owns directly, or indirectly through its subsidiaries, National Beef's U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

36.     Marfrig Global Foods S.A. ("Marfrig") is a Brazilian meatpacking conglomerate with operations around the world and, since June 2018, owns a controlling interest in National Beef Packing Company, LLC.[5] Prior to this sale, Jefferies Financial Group, Inc. ("Jefferies Financial Group") was National Beef's controlling shareholder.[6]

37.     "Defendant" or "Defendants" includes all of the named Defendants' predecessors, including beef meatpackers merged with or acquired by the named Defendants and each named Defendants' wholly owned or controlled subsidiaries or affiliates that sold Beef in interstate commerce directly to purchasers in the United States during the Class Period.

38.     Defendants sold or distributed Beef to direct purchasers or played a material role in the coordinated and collusive behavior alleged. All such entities were active, knowing participants in the conspiracy alleged, and their conduct was known to and approved by their respective corporate parent named as a Defendant.

## C.     Co-Conspirators

39.     Various other unknown persons, firms and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators whether named as Defendants or not.

---

[5] *Marfrig Concludes Acquisition of National Beef*, Marfrig (Jun. 6, 2018), http://www.marfrig.com.br/en/documentos?id=780.

[6] Jefferies Financial Group Inc., Annual Report, (Form 10-K) at 6 (Jan. 10, 2019) ("Jefferies 2018 Annual Report"). After the acquisition, Jefferies Financial Group, retained a 31% interest in National Beef.

40.     Each corporation referred to acted by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

41.     Each Defendant acted as the agent or joint-venturer of or for the other Defendants regarding the acts, violations and common course of conduct alleged.

### D.     Unity of Purpose Between Tyson, JBS, and Cargill's Respective Parent and Subsidiary Companies

#### 1.     The Tyson Defendants

42.     Tyson Foods established subsidiaries, including Tyson Fresh Meats, to act as representatives of Tyson Foods and to engage in activities that Tyson Foods would otherwise engage in. In the case of Tyson Fresh Meats, those activities include the purchase and slaughter of cattle as well as the sale of beef. Tyson Foods is not a mere holding company whose business is restricted to investments in operating subsidiaries.

43.     Tyson Foods presents itself to the public as a single unified enterprise, describing its beef business through Tyson Fresh Meats as a mere "business unit."[7] Similarly, Tyson Foods describes its current CEO, Noel White, as having previously worked for the company, even though he was previously employed as one of Tyson Fresh Meats' Senior Group Vice Presidents.

44.     Tyson Foods likewise conducts quarterly earnings calls, on which its corporate representatives discuss the operations and profits of Tyson Foods, including

---

[7] https://www.tysonfoods.com/who-we-are/our-people/leadership/noel-white. All websites cited in Section III(D) were last accessed on October 14, 2019.

Tyson Fresh Meats. During a January 31, 2014 earnings call, for example, Tyson Foods' corporate representatives informed investors that Tyson Foods had generated $58 million in operating income and a 1.6% return on sales from its beef segment business, despite that Tyson Fresh Meats directly operated that business. On the same call, Tyson Foods' corporate representatives warned that "as the calf crop declines . . . we'll probably have to curtail production." Tyson Fresh Meats undertakes production of the beef from the calf crop.

45.     On the May 2014 earnings call, Tyson Foods' then-CEO Donnie Smith informed investors that Tyson Foods managed to realize a positive return on sales in the beef segment, in part, by "run[ning] fewer head" while the company "controlled cost through continuous attention to detail and execution of the fundamentals." Tyson Fresh Meats took these actions.

46.     On the July 2014 earnings call, Mr. Smith notified investors that beef market changes meant that "it makes sense to have plants close to the feed lines, as we do." Four months later, Mr. Smith reported to investors that "as a positive for Tyson, the cattle population continues to move closer to our plants in the Midwest." Tyson Fresh Meats owns and operates those plants.

47.     Tyson Foods continued reporting the acts of Tyson Fresh Meats as its own on earnings calls in 2015. For example, on the August 3, 2015 earnings call, Mr. Smith attributed losses incurred in Tyson Food's beef segment to "the West Coast port situation. There was a significant amount of meat in the pipeline and we sold it at lower values in alternative markets rather than building inventory and tighten up our working capital. This

cost us about $84 million in the third quarter." On the same call, Mr. Smith explained Tyson Foods' strategy for cattle purchasing as implemented by Tyson Fresh Meats: "we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs."

48.     On the May 7, 2018 earnings call, Mr. Smith's successor, then-CEO of Tyson Foods Thomas Hayes, informed investors that, with regard to beef production, "we have to stop production, we have closed plants, several times in the quarter, not every plant, but several plants in the quarter." Tyson Fresh Meats owned and operated those plants to which Mr. Hayes referred.

49.     Tyson Foods and Tyson Fresh Meats guarantee each other's debts, confirming their close, synergistic relationship. Tyson Fresh Meats has issued multiple debt securities guaranteed by Tyson Foods. In a registration statement filed with the SEC,[8] Tyson Foods notified investors that Tyson Fresh Meats pledged not only its own assets to guarantee debt instruments but also those of Tyson Foods and certain "other domestic operation subsidiaries of Tyson [Foods]."

50.     Similarly, Tyson Foods reported that Tyson Fresh Meats would be the guarantor to Tyson Foods' debt securities, including debentures, notes, and all other types

---

[8] Tyson Foods, Inc., Form S-4 Registration Statement (June 26, 2009), at 4, 21
https://www.sec.gov/Archives/edgar/data/100493/000119312509139474/ds4.htm.

of debt in a prospectus filed with the SEC in 2014.[9] Tyson Foods has issued multiple Senior Notes pursuant to this arrangement, many of which do not mature until 2034 and some of which do not mature until 2044. Some of these debt instruments have been called before their maturity date.

51.    Furthermore, Tyson Fresh Meats slaughter plants in Dakota City, NE, Lexington, NE, Amarillo, TX, and Wallula, WA each list Tyson Foods, Inc. as a DBA in their registration with the U.S. Department of Agriculture's Food Safety Inspection Service ("USDA FSIS").[10]

52.    As a result, Tyson Foods does not merely provide long-term strategy guidance to Tyson Fresh Meats. Instead, Tyson Fresh Meats' entire purpose is to execute Tyson Foods's directives within the greater Tyson enterprise and to serve as an instrumentality of Tyson Foods. Tyson Fresh Meats is only "independent" to the extent Tyson Foods permits. Tyson Foods was and remains capable of exerting total control over Tyson Fresh Meats at any time.

### 2.    The JBS Defendants

53.    JBS S.A. established subsidiaries, including JBS USA, Swift, and JBS Packerland, to act as representatives of JBS S.A. JBS USA, Swift, and JBS Packerland's

---

[9] Tyson Foods, Inc., Prospectus (July 28, 2014), in between S-81 and i, https://www.sec.gov/Archives/edgar/data/100493/000119312514281360/d764243d424b5 .htm.

[10] USDA Food Safety and Inspections "Meat, Poultry and Egg Product Inspection Directory", https://www.fsis.usda.gov/wps/wcm/connect/bf8d9766-9767-4e0c-a9f1-efea0b2a42bc/MPI_Directory_Establishment_Name.pdf?MOD=AJPERES.

activities include the purchase and slaughter of cattle and the sale of beef. Absent its creation or acquisition of JBS USA, Swift, and JBS Packerland, JBS S.A. would have itself performed the same functions that these subsidiaries currently perform. JBS S.A. is not a mere holding company whose business is restricted to investments in operating subsidiaries.

54.    JBS presents itself as a unified enterprise[11] and conducts consolidated earnings calls on which JBS's corporate representatives discuss the operations and profits of JBS S.A., including JBS USA. On these earnings calls, JBS S.A. executives who self-identify using the modifier "Global"[12] describe its beef business through JBS USA as a "division" or "business unit" to investors.[13]

---

[11] JBS S.A,'s website, which functions as the entire groups' website, refers to its beef business as "JBS Beef." *See*, *e.g.*, JBS S.A. "Beef," https://jbssa.com/our-business/beef/ ("JBS® Beef offers a wide range of premium brands . . . At JBS Beef, we know that quality beef comes from quality cattle.").

[12] For example, on its second quarter earnings call for the fiscal year 2016, JBS S.A. Investor Relations manager Jeremiah O'Callaghan stated:

> With us here today, we've got the Global President of our company, Wesley Batista. . . . With us also is Mr. Gilberto Tomazoni who is the President of our Global Operations; Mr. Tarek Farahat, who is our Global President for Marketing; and also with us today is Russ Colaco who is our new Global CFO.

[13] On a March 2015 earnings call, O'Callaghan stated: "Moving onto JBS USA, where we have three business units, our beef business, our pork business and our poultry business...."

55.     Additionally, JBS S.A. commonly refers to JBS USA as its "JBS USA beef business[,]" confirming that JBS S.A. includes its beef businesses in the USA, Australia, and Canada.[14]

56.     Moreover, JBS S.A. appointed JBS USA's current CEO, Andre Nogueira. Mr. Nogueira "report[s] directly" to JBS Global Operations's CEO.[15] Mr. Nogueira had been previously appointed JBS Australia's CEO.[16] In his online "Welcome" message, Mr. Nogueira indicates that JBS USA operates "[i]n partnership with JBS S.A."[17] Additionally, Mr. Nogueira refers to JBS USA's history as the history of JBS S.A.:

> From our humble beginnings as a small, family-owned beef company started by our founder, José Batista Sobrinho (JBS), in the rolling savannas of Goiás, Brazil, in 1953, to our evolution into the world leader in protein with operations all around the globe, JBS has been guided by the same core values. . . . These values have led JBS from a single packing plant in South America, to the leading provider of meat protein in the world.

---

[14] On a May 2016 earnings call, then-Global CEO of JBS S.A. Wesley Mendonca Batista stated: "About our results, a couple of comments, was a challenge[d] quarter coming from two areas basically. One coming from our beef business in the U.S. that includes Canada and as well Australia."

[15] Press Release, JBS S.A., JBS USA Announces Leadership Succession Plan (Sept. 12, 2012), https://jbss.infoinvest.com.br/enu/1939/JBSUSAAnnouncesLeadershipSuccessionPlan.pdf.

[16] Press Release, JBS S.A., JBS Announces Changes in its Management in Australia and USA (Apr. 3, 2012), https://jbss.infoinvest.com.br/enu/1955/JBSannounceschangesinitsmanagementinAustraliaandUSA.pdf.

[17] *See* https://www.jbssa.com/about/ceo-welcome/.

57.     During all times relevant to this action, JBS S.A. caused JBS USA and its other USA subsidiaries to incur dollar-denominated debt and used that debt to pay down real-denominated obligations of JBS S.A., or vice-versa, confirming the close, synergistic relationship between JBS S.A. and JBS USA.[18]

58.     Defendants Swift and JBS Packerland have been fully incorporated into the structure of JBS USA, and were under the complete control of JBS USA, and therefore, JBS S.A., throughout all times relevant to this action. JBS USA directs and oversees all of JBS's U.S. cattle procurement, slaughter, and fabrication activities as well as beef processing and sales operations from JBS USA's corporate headquarters in Greeley, CO.

59.     Furthermore, Swift and JBS Packerland's packing operations are presented as those of JBS USA. Swift and JBS Packerland appear on USDA's list of Bonded Packers, for example, as "JBS USA Food Company, Swift Beef Company" and "JBS USA Food Company, JBS Packerland, Inc.", respectively.[19] The USDA's Food Safety and Inspections' Inspection Directive list "JBS," "JBS USA," and "JBS USA Food Company," amongst other DBAs, for Swift.[20]

---

[18] *See*, *e.g*., JBS S.A., Financial Statement for the First Quarter of 2015 (Mar. 31, 2015), at 37, https://jbss.infoinvest.com.br/enu/3343/DF%20JBS% 20310315_Ingls_Com%20Parecer.pdf.

[19] The list details those beef packers who are subject to the P&S Act and are required to maintain a bond or bond equivalent with the USDA because their annual livestock purchases equal or exceed $500,000. USDA, Agricultural Marketing Services "Packer"), https://www.ams.usda.gov/rules-regulations/packers-and-stockyards-act/regulated-entities/packer.

[20] *See*, *supra*, n. 11.

60.    As a result, JBS S.A does not merely provide long-term strategy guidance to JBS USA, Swift, and JBS Packerland. Instead, the entire purpose of these subsidiaries is to execute JBS S.A.'s directives within the greater JBS enterprise and to serve as instrumentalities of JBS S.A. JBS USA, Swift, and JBS Packerland are only "independent" to the extent JBS S.A. permits them. JBS S.A. was and remains capable of exerting total control over JBS USA, Swift, and JBS Packerland at any time.

### 3.    The Cargill Defendants

61.    Cargill established subsidiaries, including Cargill Meat Solutions Corporation, a/k/a Cargill Protein ("Cargill Meat"), to execute business on Cargill's behalf. Cargill would itself have performed substantially similar undertakings absent Cargill's creation of Cargill Meat. Cargill's website explains that in 1988, for example, before the creation of Cargill Meat, Cargill itself was engaged in the meat industry.[21] Cargill is not a mere investment mechanism which owns operating subsidiaries to diversify risk and return a profit through businesses in which it chooses to invest.

62.    Cargill holds itself out as a single, unified enterprise with its subsidiaries. On its website, for example, Cargill states that it currently has 143,000 employees and operates in 67 countries. On information and belief, those reported numbers include the employees and operations not only of Cargill, but also of all subsidiaries, including Cargill Meat.

---

[21] *See* https://www.cargill.com/about/cargill-timeline.

63.     In the Letter to Stakeholders in Cargill's 2019 Annual Report,[22] Cargill reported that it "delivered $2.82 billion in adjusted operating earnings in fiscal 2019 . . . Revenues dipped 1% to $113.5 billion. Cash flow from operations totaled $5.19 billion." On information and belief, those statistics include earnings, revenues, and cash flows from Cargill and all Cargill subsidiaries. In the same report, Cargill stated that its "[e]arnings were led by our North American protein businesses. With steady domestic and export demand, and plentiful cattle supplies, the beef business posted its third consecutive year of strong performance."

64.     Cargill has created a unified system of Purchase Order Terms and Conditions that apply to all purchases from Cargill entities, including Cargill Meat.[23] Likewise, it has created shared business services in information technology, human resources, finance, transportation and logistics, and procurement , all of which Cargill's operating subsidiaries share, including Cargill Meat.

65.     Cargill's website lists Cargill's "executive team," which Cargill Chairman and CEO David MacLennan leads.[24] Mr. MacLennon's profile explains that, while employed by Cargill, Mr. MacLennon "supervised several businesses in Cargill Protein."

66.     Cargill takes an active role in the management of Cargill Meat; it does far more than set long-term strategy for Cargill Meat.

---

[22] Cargill, 2019 Annual Report, (July 30, 2019), at 4-5, https://www.cargill.com/doc/1432144962450/2019-annual-report.pdf.

[23] *See* https://www.cargill.com/page/cargill-po-terms.

[24] *See* https://www.cargill.com/about/david-maclennan.

67.     Cargill identifies other members of its executive team by area of responsibility. Brian Sikes is described as "leading Cargill's global protein and salt businesses."[25] Cargill indicates Mr. Sikes does far more than setting long-term strategy for Cargill Meat. Mr. Sikes "applies nearly three decades of experience managing complex supply chains. . . . To advance this aim, he drives strategic disruption and delivers products for today's customers and the next generation of global consumers."

68.     Cargill has employed Mr. Sikes since 1991. Since then, Cargill reports that Mr. Sikes had direct management responsibilities for Cargill's protein businesses, which on information and belief, include Cargill Meat. Mr. Sikes "oversaw Cargill's protein business in North America and Europe" and "led the transformation of the North American protein business, which has delivered strong financial results and expanded offerings in line with shifting demand for value-added protein, sustainable supply chains and alternative proteins." He lives in Wichita, Kansas, Cargill Meat's principal place of business.

69.     Additionally, Cargill's slaughter plants in Fresno, CA, Wyalusing, PA, and Friona, TX all list either "Cargill Beef Packers," "Cargill Regional Beef," or "Cargill Beef" as DBAs with the USDA FSIS.[26]

70.     As a result, Cargill does not merely provide long-term strategy guidance to Cargill Meat. Instead, the subsidiary's entire purpose is to execute Cargill's directives

---

[25] *See* https://www.cargill.com/about/brian-sikes.

[26] *See*, *supra*, n. 11.

within the greater Cargill enterprise and to act as an instrumentality of Cargill. Cargill Meat is only "independent" to the extent Cargill permits; Cargill was and remains capable of exerting total control over Cargill Meat at any time.

## IV.    TRADE AND COMMERCE

71.    Approximately 25.8 million live steers were slaughtered and processed into beef in the United States in 2017 alone. Live steers weigh about 1,000 pounds and yield about 450 pounds of edible beef. The edible beef becomes what is known as "boxed beef" or smaller case-ready consumer cuts sold directly to Plaintiff and Class Members.

### A.    Beef Distribution Chain

72.    The Beef value chain includes four stages: (1) ranch and farm grazing, (2) feedlot, (3) meatpacking, and (4) wholesale/distribution and retail as detailed below:



73.     In the first stage, ranches and farms birth and raise cattle. There are hundreds of thousands of ranching operations in the United States, and as many as 90% are family-owned or individually operated.[27]

74.     In the second stage, feedlots engage in intensive feeding that raise the weight of cattle prior to sale. Once cattle reach between 950 and 1,500 pounds, they are sold to meatpacking operations as "fed cattle."

---

[27] *Available at* http://www.beefusa.org/beefindustrystatistics.aspx

75.     In the third stage, the Defendants and other producers purchase and transport fed cattle to a packing plant for slaughter and processing into various cuts the meatpackers sell as "boxed beef" to various direct purchasers, such as distributors, large retailers, and foodservice operations, including the Plaintiff in this action.

76.     Distributors, such as Plaintiff, large retailers, and foodservice operations purchase processed Beef and sell it to other, smaller retailers or consumers. Large retailers may include supermarkets and wholesalers, such as Sysco, US Foods, Costco, and Sam's Club.

**B.     Structure of Beef Industry**

77.     Defendants' conspiracy to maintain supracompetitive Beef prices was facilitated by the structure of the meatpacking market. The Beef meatpacking industry has all the hallmark features of a market that is susceptible to cartelization, including high concentration, commoditization, and inelastic demand. Concern over anticompetitive conduct by Beef processors was a leading driver for the initial passage of the Sherman Act, as the Federal Trade Commission reminded the public in 2008.[28]

---

[28] *See* Note by the United States, pg. 1 Roundtable on Monopsony and Buyer Power, October 13, 2008 ("The 1890 debates in both houses of the United States Congress demonstrated concern with the exercise of market power on both the buying and selling sides of the market. Many legislators singled out large meat packers for condemnation, and they were condemned as much for reducing the prices paid to cattle farmers as for raising prices to consumers. In response, Congress passed the Sherman Act, "aimed at preserving free and unfettered competition as the rule of trade." "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.") (*available at* https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/monopsony.pdf).

### 1.    The Beef Meatpacking Industry is Highly Concentrated

78.    Market concentration facilitates collusion. Collusive agreements are easier to implement and sustain where a few firms control much of the market. Practical matters, such as coordinating cartel meetings and exchanging information, are easier when there are fewer members of the cartel. A high degree of market concentration simplifies coordination because there is little outside competitive presence to undermine the cartel. Additionally, with fewer members in a cartel, it is easier for cartel participants to monitor each other's actions related to supply and pricing. And with fewer firms in the market, the short-term gains that might be achieved by undercutting the cartel price and gaining a short-term increase in market share would be outweighed by the greater long-term profits for a colluding firm in a concentrated industry with artificially increased prices.

79.    By contrast, if an industry is divided into a large number of small firms, the current gain from cheating the cartel is large relative to the firm's possible gains from the cartel's continuing future success (*i.e.*, the profits from sales captured from other cartel members through undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future are greater than the firm's future share of the total cartel profits if collusion were to continue successfully).

80.    The Beef industry experienced increased market concentration leading up to and during the Class Period. In 2001, Tyson purchased IBP, then the United States' largest Beef packer. In 2002, Cargill purchased another Beef packer, Taylor Packing. In 2007 and 2008, JBS acquired Swift & Co and Smithfield Beef Group, respectively the third- and fifth-largest Beef packers in the United States.

81.     Throughout the Class Period, the four Defendants controlled approximately 81-85% of the fed cattle slaughter market.[29] The next largest meatpacker had only a 2-3% percent market share. The Defendants chokehold on the market allowed for the conspiracy to occur, continue, and prosper.

## 2.     The Meat-Packing Market Features High Barriers to Entry

82.     Barriers to entry are obstacles that prevent new competitors from easily entering the market. They restrict competition in a market and make it easier for those taking up the market to collude with each other, and harder for would be competitors to enter the market to undermine the cartel.

83.     The construction of a large packing plant requires an investment of at least $250 million-$350 million, and two or more years to obtain necessary permits, plan, design, and build.[30]

84.     These barriers often cause new entrants, for example Northern Beef Packers[31] and Kane Beef,[32] to file for bankruptcy shortly after attempting to enter the market. Relative insulation from the threat of new competitors enabled Defendants to maintain their unlawful agreement and supracompetitive prices without constraint.

---

[29] Cattle Buyers Weekly Market Share of Steers and Heifers.

[30] *U.S. v. JBS* Amended Complaint, ¶41.

[31] *See* https://www.feedstuffs.com/story-northern-beef-packers-goes-belly-up-52-100764 (last accessed April 29, 2019).

[32] *See* https://www.meatpoultry.com/articles/20783-sam-kane-beef-processors-files-for-chapter-11 (last accessed April 29, 2019).

### 3. Beef is a Commodity Product

85.     A commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services. Markets for commodity products are conducive to collusion because competition is limited to price, as opposed to other attributes like quality or customer service.[33]

86.     Beef is a commodity. For example, beef roasts from Tyson and Cargill are virtually indistinguishable and share similar nutritional values. The USDA recognizes boxed beef as a commodity, and posts daily boxed beef prices.[34] Options and futures for fed cattle, from which boxed beef is produced, are traded on the Chicago Mercantile Exchange ("CME").

### 4. The Demand for Beef is Inelastic

87.     Beef demand is also relatively insensitive to price changes. According to a recent study of beef demand, "Since beef has an inelastic demand, industry total revenue increases when prices rise as there comparatively is a limited reduction in volume

---

[33] *See, e.g.*, https://www.investopedia.com/terms/c/commodity.asp;https://kresgeguides.bus.umich.edu/c.php?g=199860&p=1314301 (last accessed May 24, 2019). *See also* Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization, Fourth Ed., 200 (2005) (discussing that homogenous or undifferentiated good are "viewed as identical as consumers … [and] as perfect substitutes for each other.").

[34] *See, e.g.,* https://www.ers.usda.gov/webdocs/publications/47486/17470_tb1911fm.pdf?v=41029; https://www.ams.usda.gov/sites/default/files/media/LMR2018ReporttoCongress.pdf.

purchased."[35] The same study concluded that chicken and pork had little impact on Beef pricing. Accordingly, when prices are increased to direct purchasers at a supra-competitive level, there will not be a decrease in Beef purchases, nor a switch to other proteins such as chicken or pork.

## V.    VIOLATIONS ALLEGED

60.    By the beginning of 2015 the Defendants were facing lower profitability and shrinking profit margins. Rather than acting independently to maintain profitability, Defendants agreed to collectively reduce slaughter and reduce purchases of fed cattle, which has the effect of raising prices in the direct purchaser market for Beef. The result were wholesale prices above a competitive level.

### A.    Defendants Agreed to Reduce Slaughter Volumes

60.    As confirmed by Witness 1, each of the Defendants expressly agreed to periodically reduce their respective slaughter volumes, resulting in wholesale prices above competitive levels.

61.    Witness 1 is a former employee of one of the Defendants ("Defendant 1"). Witness 1 was a quality assurance officer ("QA") at one of Defendant 1's slaughter plants located within the Texas Panhandle / Western Kansas region ("Slaughter Plant 1" and "Panhandle Region", respectively) for over 10 years until his employment ceased in 2018.

---

[35] Glynn Tonsor, Jason Lusk, Ted Schroeder, *Assessing Beef Demand Determinants*, (Jan. 18, 2018) at 7-9, https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf.

62.     During the Class Period, Witness 1 acted as a head QA and had primary responsibility for the plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, *i.e.*, head, hide, and internal organs removed. The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

63.     Witness 1 learned of the Defendants' slaughter reduction "agreement" from another employee in a position to know about the unlawful "agreement" – Slaughter Plant 1's head of fabrication ("Fabrication Manager").

64.     Witness 1 reports having multiple discussions with the Fabrication Manager during which the Fabrication Manager explained that all of the Defendants agreed to reduce their purchase of fed cattle and slaughter volume. For example, during one conversation, the Fabrication manager specifically admitted that the Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high fed cattle prices.

65.     Witness 1 reports that he was in the Fabrication Manager's office when the Fabrication Manager received an angry phone call from his immediate supervisor, who worked out of Defendant 1's central office.

66.     After the call concluded, Witness 1 reports that he asked the Fabrication Manager how "many are we [Slaughter Plant 1] cutting [*i.e.*, fabricating]?" Witness 1 reports that the Fabrication Manager replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that

effect).[36] Witness 1 then reports asking the Fabrication Manager whether other Defendants' plants were also cutting back their kill. Witness 1 reports he recalls that the Fabrication Manager answered Witness 1's question as follows: "Yes, they are. We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

67.    Witness 1 recalls specifically that the Fabrication Manager used the word "*agreement*" and understood that he was referring to at least all of Defendants' plants in the Panhandle Region, namely Tyson Amarillo, Texas; JBS Cactus, Texas; Cargill Friona, Texas; and National Beef, Liberal, Kansas. Each of these plants provide a significant portion of each Defendants' fed cattle slaughter capacity (at least 20% in the case of each Packing Defendant).

68.    Witness 1 is certain that the Fabrication Manager intended to convey that all of the Defendants were reducing their slaughter volumes by agreement with their competitors in response to what they perceived as high prices for fed cattle and was not simply commenting on the fact that one or some of the Defendants had independently decided to do so.

69.    Witness 1 understands that the Fabrication Manager had first-hand knowledge of Defendants' anticompetitive agreement. The Fabrication Manager continues to work at Slaughter Plant 1, where he has worked for over 15 years in that role. In that

---

[36] Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities. Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses the were already hanging in the coolers. This would allow Defendant to reap the benefits of higher wholesale prices in the short term.

capacity, the Fabrication Manager reported directly to Defendant 1's head office. As head of fabrication, the Fabrication Manager needed to be informed as to cattle buying, cattle slaughter, and Beef selling aspects of Defendant 1's business. He thus interacted with personnel across Defendant 1's business.

70.     Witness 1 reports that prior to working for Defendant 1, the Fabrication Manager worked at another Packing Defendant ("Defendant 2") for a number of years. Witness 1 understands that Fabrication Manager was head of fabrication for the slaughter plant operated by Defendant 2 in the Panhandle Region at which he was employed ("Slaughter Plant 2").

71.     The Fabrication Manager regularly told Witness 1 that he was in contact with his former colleagues at Slaughter Plant 2, including his replacement there. The Fabrication Manager also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at other Packing Defendant plants.

72.     The Fabrication Manager would often provide Witness 1 with detailed information as to the current and future operations of the Defendants' nearby packing plants. Witness 1 regularly stopped by the Fabrication Manager's office prior to starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days, as this affected the execution of his and his team's responsibilities. Witness 1 and the Fabrication Manager had a good working relationship.

73.     Witness 1 stated that Slaughter Plant 1 had a 5,500-6,000 head per day slaughtering capacity and might drop its kill level back to around 4,800-5,200 head per day when implementing Defendants' agreement. While Defendant 1 implemented the

Defendants' agreement by buying and slaughtering fewer cattle, it also collusively reduced supply by running its slaughter plants at reduced hours, operating those plants at lower "chain speeds," and/or scheduling maintenance shutdowns.

**B.      The Agreement Resulted in Significantly Reduced Slaughter Volumes by the Defendants during the Class Period**

74.      The impact of Tyson, JBS, Cargill, and National Beef's collusive slaughter reductions throughout the Class Period is illustrated in Figures 2 and 3 below, reproduced here. Figure 2 compares the average annual slaughter volume of the Defendants during the pre-Class period and the portion of the Class Period for which data exists against that of the other US beef packers. It shows that Tyson, JBS, Cargill, and National Beef have each reduced their annual slaughter volumes relative to the pre-Class Period, while Independent Packers have increased their volume.



**Average Pre- and Post-Class Period Fed Cattle Slaughter – Defendants vs. Smaller/Independents**



75.     Figure 3 also compares the Defendants' and the Independent Packers' annual slaughter volumes during the Class Period and the pre-Class Period but breaks out the slaughter volumes for each year of the Class Period for which data is available. The graph confirms that Tyson, JBS, Cargill, and National Beef each slaughtered less in every year in the Class Period compared to their pre-Class Period averages. It also shows that while Tyson, JBS, Cargill, and National Beef each gradually increased their slaughter volume

from 2015 onward, their rate of increase was far slower than that of the Independent Packers.



**Pre- and Post-Class Period Fed Cattle Slaughter – Defendants vs. Smaller/Independents (By Year)**

### C.      Defendants Closed or Idled Plants, and Refrained from Expanding Capacity

76.  In order to further the agreement to reduce slaughter and increase margins, the Defendants reached an understanding to significantly reduce slaughter capacity in the

period prior to the conspiracy and into its early stages. Defendants collectively refused to

expand their slaughter capacity of fed cattle once these permanent closures occurred.

- On January 17, 2013, Cargill announced that it would idle its Plainview, Texas beef processing facility on February 1, 2013.[37] This closure decreased slaughter capacity by 4,650 cattle per day. The Plainview, Texas plant had been one of Cargill's larger plants.[38] One report remarked that this single plant shutdown corresponded to "nearly 4% of the U.S. beef industry current capacity."[39]

- As if on cue, on February 1, 2013, a second Defendant, disclosed a reduction in live cattle processing. Tyson reported a "reduction in live cattle processed" in its Q1 2013 Form 8-K despite reporting "increased production due to sufficient cattle supply and strong demand for our beef products" for the previous quarter in its Q4 2012 Form 8-K.[40]

- Similarly, a third Defendant acquired a plant in April 2013 but announced its plan to keep the plant idle. JBS assumed ownership of a beef packing plant in Nampa, Idaho, with the capacity to process 1,100 cattle per day but had "no immediate plans to reopen the facility."[41] The plant appears to still be idle at the time of this filing.

- Around the same time, a fourth Defendant reduced its live cattle processing. National Beef shut its Brawley, California plant in June 2014.[42] This closure decreased slaughter capacity by 2,000 cattle per day.

---

[37] *See* https://www.cargill.com/news/releases/2013/NA3070552.jsp (last accessed Aug. 22, 2019).

[38] *See* http://www.angusbeefbulletin.com/extra/2013/01jan13/0113mk-cargill-plant.html#.XV7WIehKiUk (last accessed Aug. 22, 2019).

[39] Apr. 3, 2013 Votorantim Equity Research Report on JBS.

[40] Tyson Q1 2013 Form 8-K; Tyson Q4 2012 Form 8-K.

[41] *See* https://jbssa.com/about/news/2013/04-04/#.XV3HhOhKiUl (last accessed Aug. 21, 2019).

[42] *See* https://www.nationalbeef.com/About/News/Pages/National-Beef-to-Close-Brawley.aspx (last accessed April 29, 2019).

- On July 30, 2014, Cargill then announced that it would close its Milwaukee, Wisconsin plant on August 1, 2014. This closure decreased slaughter capacity by 1,300 to 1,400 cattle per day.[43]

- In the first and second quarters of 2015, JBS closed six beef processing plants.[44] On September 11, 2015, Cargill announced that it would sell the aforementioned Plainview, Texas plant that was idled in February 2013.[45]

- To match these closures, Tyson posted a "reduction in live cattle processed" for each of the eight quarters from Q2 2014 to Q1 2016, as reported in its Form 8-K for the same period.[46] This was in spite of Tyson reporting "historically high wholesale beef prices[,]" "[l]ow production volumes relative to demand[,]" and "adequate supplies for [its] beef operations as [its] plants are located close to the fed cattle supplies" in its Q1 2014 8-K.[47]

- Additionally, Tyson closed its Denison, Iowa plant in August 2015.[48] This closure decreased slaughter capacity by 2,000 cattle per day.

77. The Defendants took other actions to restrict supply in the months leading up to and during the Class Period. For example, Tyson closed a Cherokee, Iowa processing plant in 2014. According to media reports, Tyson officials "told the city they would consider handing over the shuttered plant – but not to any firm that they believe is competition."[49] In 2018, four years after the initial closure, Tyson allowed another

---

[43] *See* https://www.cargill.com/news/releases/2014/NA31669068.jsp (last accessed April 29, 2019).

[44] JBS August 14, 2015 Q2 Earnings Call.

[45] *See* https://www.cargill.com/news/releases/2015/NA31890857.jsp (last accessed Aug. 22, 2019).

[46] Tyson Q2 2014 Form 8-K; Tyson Q4 2014 Form 8-K; Tyson Q5 2014 Form 8-K; Tyson Q1 2015 Form 8-K; Tyson Q2 2015 Form 8-K; Tyson Q3 2015 Form 8-K; Tyson Q4 2015 Form 8-K; Tyson Q1 2016 Form 8-K.

[47] Tyson January 31, 2014 Q1 Earnings Call.

[48] *See* https://www.tysonfoods.com/news/news-releases/2015/8/tyson-foods-reduces-beef-production-capacity (last accessed April 29, 2019).

[49] *Available at* https://www.desmoinesregister.com/story/money/business/2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/.

company to purchase the plant, but only after inserting a requirement into the deed that "limited the amount of cattle that can be processed at the plant for the next 10 years."[50]

78.    Collectively, these closures reduced the industry's annual slaughter capacity by millions of cattle per year. Defendants' plant closures, even excluding the continued idling of the Nampa plant, stripped out approximately two million head from the industry's annual slaughter capacity. Defendant offered pre-textual explanations, such as a lack of available cattle in the adjacent regions and plant inefficiencies regarding each closure.[51]

79.    As a result, and as shown below, the United States experienced both declining fed cattle slaughter capacity and underutilization of that capacity.

---

[50] *Available at* https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/.

[51] National Beef even rejected a significant package of incentives offered by local government, utilities and nearby feedlots when it decided to close its Brawley plant. "National Beef plant closing Brawley Facility," PROGRESSIVE CATTLEMEN (Mar. 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plantclosing-brawley-facility.

**Annual U.S. Fed Cattle Slaughter Capacity and Utilization Over Time.**



80.  While the above does show a slight increase in slaughter capacity between 2016 and 2017, this is attributable to non-Defendant One World Beef Packing's reopening of the Brawley, California plant closed by National Beef. Non-Defendant Iowa Premium Beef (Tama, Iowa, 1,100 head per day) and Lime Springs Beef (Lime Springs, Iowa, 540 head per day) also entered the market in 2015 to partially offset some the Defendants' closures. Of the Defendants, only JBS undertook any notable capital investment that increased industry slaughter capacity during the Class Period. Even then, its expansion of its Hyrum, Utah plant in 2015 and 2016 was directed at increasing its culled cow slaughter capacity, as opposed to fed cattle. Cull cows are used for ground beef, and not boxed beef which come from fed cattle. And while Tyson finally completed its upgrades to its Dakota City, Nebraska plant in April 2015, the project, commenced in March 2012, had been scheduled for completion in mid-2013, and reported to be near completion as early as March 2013. Further, while slaughter volumes have improved from 2014 and 2015's lows, this has been

driven by Independent Packers. By comparison, each Packing Defendant has been slow to raise their slaughter volumes.

### D.   Defendant Publicly Signaled Each Other to Keep Slaughter and Capacity Restrained

81.   One of the methods by which the Defendants were able to coordinate and monitor their collusive efforts to reduce supply was through earnings call statements:

- During a March 2013 Q4 Earnings Call, JBS affirmed that it would not increase capacity: "Yeah, so about beef in US like I mentioned and like you mentioned here in the call, we expect and we believe the market will improve in some way from the second quarter on. We are not adding capacity. So we will not increase or improve our capacity utilization in US because we need to balance in our business supply and demand. So everybody knows that the US herd is shrinking and there is less cattle available. So we are not going to increase capacity or to run our plants with better capacity utilization. Actually the other way around, we are also reducing in some extend, reduce some hours to balance better the market and to try to improve margin in our business."[52]

- During a January 2014 Q1 Earnings Call, Tyson's COO stated that National Beef's decision to close its Brawley, California plant "is consistent, I guess, with what we've been saying all along, as the calf crop declines and the noncompetitive feedlot areas or noncompetitive plants or the combination thereof, we'll probably have to curtail production . . . to some extent, we've always felt that—and anticipated something like that would happen." [53]

- During a May 2014 Earnings Call, JB forecasted for the industry: "For 2015, I think beef will keep being tight. I don't see any increase in beef supply in 2015 in U.S."[54]

- During an August 22, 2014 Q2 Earnings Call, JBS's Global CEO Wesley Mendonça Batista noted, "In the last 12 months or more, year-and-a-half, we saw five plants that [shut down in the U.S.], and [that definitely] is going to help to balance the supply and the industry capacity to be much more balanced, and we are optimistic that we are going to see good improvement on the beef business." He further stated, "[A] couple of things that we are more optimistic about the beef business in U.S. First of all is, of course, the industry adjusting capacity is a key factor. Five plants

---

[52] JBS March 14, 2013 2012 Q4 Earnings Call.

[53] Tyson January 31, 2014 Q1 Earnings Call.

[54] JBS May 15, 2014 Q1 Earnings Call.

closed in the last year-and-a-half, so this looks almost 8,000 [head] per day out of the market, so for sure this is a key factor to help balance the industry to have a better margin and a better results. . . . in our view, the worst period on the beef business is behind."[55]

- The following quarter, JBS's Mr. Batista suggested in a November 2014 Q3 Earnings Call that his company's recent acquisition of XL Foods' Omaha, Nebraska plant was probably a mistake, and that slaughter capacity must be reduced in California and at least one other U.S. region ("If you want to be balanced you need to have capacity to be shut there.").[56]

- During a November 2014 Q4 Earnings Call, Tyson projected for the industry, "So as you know with really high beef prices, beef volume is down. . . . [W]e already know that the beef supply, the beef herds are going to be down another 4%, which portends pretty high beef prices again into the future."[57]

- During Tyson's 2014 Investor Day, it indicated that high beef prices would be the norm: "Now, if you look at elevated beef prices, coming in to this year, beef supply will be down about 5% or so versus last year. Next year, because we already see the calf crop, we know that next year's beef supply will be down another 4% or so. So, elevated beef prices are here to stay for a while. It would take us several years, maybe out to 2020 to be able to grow the supply of cattle back to FY 2013 number. So we're going to have high beef prices for a while…"[58] Further, Tyson stated it was managing its margin: "By rationing that [fed cattle] supply, by lowering that volume coming into the market, we're able to generate that margin spread. And that's not going to change anytime soon. As we continue on in these tightened supply periods, we're going to continue to manage margin. And our expectation as we roll into next years, we're going to see similar type earnings as what we've seen."

- During a May 2014 Q4 Earnings Call, Tyson conveyed that it was striving for margin and not market share: "For fiscal 2015, we expect fed cattle supply to be down 5% to 6% from last year. And we think we've experienced the bottom of the beef supply cycle. After this year, we believe we'll see slow incremental improvement in supply. Our Beef segment results should improve in the back half of the year, and while profitable for the year, fiscal 2015 results are expected to be below fiscal 2014. It is important to remember that we'll continue to run our Beef business for margin not market share."[59]

---

[55] JBS August 22, 2014 Q2 Earnings Call.

[56] JBS November 13, 2014 Q3 Earnings Call.

[57] Tyson November 17, 2014 Q4 Earnings Call.

[58] Tyson December 10, 2014 Investor Day Transcript.

[59] Tyson May 4, 2014 Q4 Earnings Call.

- In August 2015, Tyson's then-CEO Donald Smith publicly stressed the need for further slaughter reductions during the company's Q3 Earnings Call: "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate, and conditions are expected to improve for the long term." He also admitted that "industry capacity utilization [was] probably in the low 70s."[60] The next quarter, Mr. Smith acknowledged that "excess industry capacity … limits [Tyson's] ability to drive margins above [] 1.5% to 3%, we think."[61]

- In August 2015, in response to a question regarding "beef capacity"—specifically, competitors "talking about how many plants they closed during the quarter et cetera . . . it looks like an industry-wide move[,]"—JBS's Mr. Batista remarked that JBS "closed six plants in these two quarters . . . we are the leader in this market and we closed this plant as well . . . for me it's clear that now the industry is balanced in terms of cattle availability and also demand. And for me it's clear that the industry is not going to put back any plants until the industry see a sustainable demand recovery and as well cattle availability."[62]

- JBS's André Nogueira de Souza publicly praised the Defendants' efforts to reduce industry-wide slaughter capacity through plant closures on its November 12, 2015, Q3 Earnings Call, noting "the reduction that we saw in the capacity of production in U.S. [] with the shutdown of 90 plants the last two years reduce the cattle – the capability of U.S. to process 3.5 million" and that it had left the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018." [63]

- On a May 2016 Q1 Earnings Call, JBS's Mr. Nogueira de Souza remarked, "So I don't see any imbalance in this near future, even cattle is coming back and we're going to see a little bit more production of beef this year and next year. It's still way, way below how it was few years ago and we'll be balancing at this side because a lot of plant was shut but it's too way below our historical production level."[64]

As demonstrated, Defendants often discussed the industry cuts as a whole on these earnings calls.

---

[60] Tyson August 3, 2015 Q3 Earnings Call.
[61] Tyson November 24, 2015 Q4 Earnings Call.
[62] JBS August 14, 2015 Q2 Earnings Call.
[63] JBS November 12, 2015 Q3 Earnings Call.
[64] JBS May 12, 2016 Q1 Earnings Call.

**E.**     **The Collusive Agreement to Reduce Resulted in an Increased Spread Between the Fed Cattle and Beef Prices**

82.     Between 2009 and 2014 fed cattle prices steadily increased due to a natural shortage following droughts from 2011 through 2013, and wholesale prices of Beef moved in tandem. As a result, the Defendants' profits were slim with margins at between 1% and 3%.

83.     Prior to 2015, the prices of cattle and Beef generally moved in tandem with a reasonably constant relationship (or margin) between them. As the DOJ has recognized, when the Beef market is functioning competitively, there is a strong relationship between the supply of cattle and the price being charged to direct purchasers:

> [A]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits.[65]

84.     In a competitive market, lower cattle prices would lead to correspondingly lower wholesale Beef prices. But once the conspiracy was initiated, the spread between cattle and Beef prices diverged significantly. The Defendants' agreement to act in concert successfully altered the relationship between cattle and Beef prices, and direct purchasers were overcharged for Beef.

---

[65] Amended Complaint, ¶ 26-27, *U.S. v. JBS SA* (N.D. Ill., Eastern Division) (08-cv-05992), filed on November 7, 2008.

85.    Beginning in 2015, the "spread" between fed cattle and boxed beef wholesale prices began to diverge, with the spread increasing dramatically throughout the class period:



86.    According to data from the USDA Economic Research Service, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to the present than it was in the preceding 5 years. In 2010 through 2014, the average farm to wholesale spread was about $34, whereas in 2015 through 2018 it was about $52, a **62.8% increase**.

**F.      Tyson and JBS Attribute Their Record 2017 & 2018 Profits to "Visibility" into the Beef Supply Chain**

87.      Tyson and JBS continued to report elevated profit margins throughout 2017 and 2018. On earnings conference calls during this period, executives from JBS and Tyson frequently attributed record profits to their ability to understand the amount of cattle in the Beef supply chain in upcoming years. JBS executives also noted that they were not taking market share from competitors, and that elevated margins had been boosted by the capacity decreases following plant closures.

88.      On **August 7, 2017**, Tyson reported a beef business operating margin of **3.7 percent** for the third quarter and emphasized its confidence in the beef business going forward: "With ample supplies of cattle, we see very good conditions for our Beef business as far out as 2020, as we enter the early stages of a multiyear expansion cycle. Absent a shock to the system such as a drought or an import ban, our Beef business is well-positioned for profitable, long-term growth." [66] Tyson acknowledged that it was considering raising its previously-forecasted 1.5 to 3 percent normalized operating margins. But, despite "ample" supply of cattle and high demand for beef, the Defendants did not increase cattle purchases or cattle slaughter.

89.      On **February 8, 2018**, Tyson reported quarterly operating beef margins of 6.6 percent and yearly beef margins **close to 6 percent** and emphasized that it had "pretty good visibility into '19 and '20 at this point." "We see the number of animals out there,"

---

[66] Tyson August 7, 2017 Q3 Earnings Call.

executives said. Tyson further stated that "**we have…good visibility into the cattle that's out there**. We see the number of animal so that's that certainly good for us." [67]

90.     On **May 7, 2018,** Tyson announced forecasted beef operating margins of **6 percent** for the year—at least twice its normalized operating margin range of 1.5 to 3 percent. Tyson claimed the huge jump was attributable to "those cattle on feed reports and knowing that the supplies in our region are exceptionally good." [68]

91.     Likewise, on **May 15, 2018**, JBS reported an EBITDA margin of **6.1 percent** for the quarter and forecasted that the company would enjoy record beef margins for the next two quarters. JBS emphasized that its performance was not based on "taking share from anyone." [69]

92.     On **August 6, 2018**, Tyson reported a beef operating margin of **8 percent** for the quarter. Tyson stated that it had an "optimistic outlook" because "we have good visibility into 2021…that's good because we do see the number of animals that are out there." [70]

93.     On **August 15, 2018**, JBS reported a beef EBITDA margin of **10.2 percent** for the quarter and stated that it was "**moving the overall margin in beef… [to] a different level that was in the past**." JBS went on to say that it benefitted from shutting several

---

[67] Tyson February 8, 2018 Q1 Earnings Call.

[68] Tyson May 7, 2018, Q2 Earnings Call.

[69] JBS May 15, 2018 Q1 Earnings Call.

[70] Tyson August 6, 2018 Q3 Earnings Call.

plants in the previous five years, and that it could not see how U.S. beef could "be less profitable in 2019 compared to … 2018."[71]

94.     On **November 13, 2018**, Tyson reported record beef operating margins of **8.9 percent for the quarter and 6.7 percent for the year**, and stated that it expected similar results in the following years thanks to visibility into cattle supply: "As we look at 2019, 2020, even in 2021 we frankly we don't see a lot of change. The supply appears to be relatively stable. We have a good sense of what that looks like just due to the calf crop that gives us good visibility for at least a couple of years."[72]

## VI.   ADDITIONAL FACTORS SUPPORTING THE EXISTENCE OF DEFENDANTS' CONSPIRACY

### A.     Defendants Took Advantage of Numerous Opportunities to Collude

95.     Defendants are members of industry trade associations and forums and regularly attend industry events, including those listed below. These events provided ample opportunity to facilitate conspiratorial conduct through in person communication.

96.     For example, the National Cattlemen's Beef Association ("NCBA") holds an annual convention (known as "CattleCon"), a summer conference, a legislative conference, and regional meetings.[73] The NCBA Product Council, which includes representatives of the Defendants, meets quarterly for the invitation-only Beef Executive Forum.[74] The Defendants also participate in meetings of the Beef Checkoff program run by the Federal

---

[71] JBS August 15, 2018 Q2 Earnings Call.
[72] Tyson November 23, 2018 Q4 Earnings Call.
[73] *See* https://www.ncba.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20 Allied%20Industry%20Brochure.pdf (last accessed May 2, 2019).
[74] *See* https://www.ncba.org/productcouncilmembers.aspx (last accessed May 2, 2019).

of State Beef Councils, which are held contemporaneously with the NCBA summer and winter meetings.[75]

97.     The U.S. Meat Export Federation ("USMEF")—a trade association that develops export opportunities for U.S. protein producers and whose leadership includes current and former employees and officers of Defendants—also holds both spring and fall conferences and monthly international trade shows.[76]

98.     The Defendants were among the founding members of the Global and U.S. Roundtables for Sustainable Beef ("USRSB") and continue as members today.[77] The Defendants participate in USRSB annual meetings each spring, and JBS and Cargill have leadership positions in certain working groups.

99.     Defendants also came together for numerous meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute ("AMI"). The Defendants each maintained membership in AMI / NAMI throughout the Class Period[78] and served on the AMI and NAMI Board of Directors, including:

a.     Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson;

b.     André Nogueira de Souza, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS USA;

---

[75] *See* https://www.ncba.org/federation.aspx (last accessed May 2, 2019).

[76] *See* http://www.usmef.org/about-usmef/membership/usmef-members/ (last accessed May 2, 2019).

[77] *See* https://www.usrsb.org/processors.aspx (last accessed May 2, 2019).

[78] *See* https://www.meatinstitute.org/index.php?ht=d/sp/i/2343/pid/2343 (last accessed April 30, 2019).

c.    Tim Klein of National Beef; and

d.    John Keating of Cargill.

100.   The industry's "Annual Meat Conference," described on its website as "a complete education and networking experience," provides another opportunity for the Defendants to connect and communicate. Many of the Defendants' high-level executives have been attending this conference for years: the list of registered attendees in 2012 included eight executives from JBS USA; then-CEO of Tyson Foods Donnie Smith and twelve other Tyson executives.

101.   NAMI also sponsors an annual "Meat Industry Management Conference," which NAMI promoted as focusing on topics including "economics," "general business," and an "always popular Answers Actions session."

102.   In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit." That summit included "networking opportunities and social events" including a golf tournament, receptions, an Issues, Answers, Actions Breakfast, the annual Board of Directors meeting, and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 Summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

103.   Defendants' CEOs and top-level executives attend many of these meetings and events each year. As a result, they regularly have the opportunity to discuss pricing,

production, and other proprietary information in an informal setting, and confirm that competitors remain committed to artificially restricting Beef supply.

**B.    The Defendants Supply Restraints Were Not Offset and Were Further Exacerbated by Reductions in Imports**

104.    The Defendants did not offset their slaughter reductions by importing more cattle. The below chart shows that starting in 2015, there was a significant decrease in imports. This downward trend continued throughout the class period as evidence by this chart:



51

105.    The decrease in domestic slaughter, combined with the decrease in imported fed cattle for slaughter, resulted in prices to Plaintiff and Class Members above a competitive level.

## VII.    ANTITRUST INJURY

106.    The fed cattle market is an oligopsony consisting of the four Defendants that purchase most of the cattle for slaughter. When Defendants coordinate to restrict supply, the market effectively becomes a monopsony where the cattle ranchers have no choice but to accept the price offered by the Defendants. As illustrated below, in a competitive market, the Defendants would purchase a quantity of fed cattle (*Cattle $Q_C$*) where the supply intersects the demand/marginal revenue product curve and the price (*Cattle $P_C$*) would be equal to the additional revenue that the Defendants would receive for fed cattle. When the Defendants coordinate to restrict supply, they can use their monopsony power to pay a lower price for fed cattle (*Cattle $P_M$*) since the cattle ranchers have no choice in selling their fed cattle. This monopsony power enables the Defendants to maximize their profit by purchasing fewer cattle (*Cattle $Q_M$*) at a lower price.



107.    Likewise, due to Defendants' lack of off-setting imports of fed cattle, the restricted supply of fed cattle resulted in a restricted supply of Beef in the downstream market. As Defendants have market power in the downstream market for Beef, they can maximize profit by colluding to produce based on their marginal revenue curve instead of the market demand curve. Market power enables them to maximize profit by colluding to produce less Beef than the market demands (*Beef Q₁* instead of *Beef Q_C*) and charging higher prices (*Beef P₁* instead of *Beef P_C*). When Defendants collude to restrict the slaughter of fed cattle and therefore further restrict the supply of Beef, the Defendants' production shifts along their marginal revenue curve, increasing price further to *Beef P₂*.



108.   Due to the Defendants' market power in the downstream market for Beef,

they were able to raise prices without fear of competition from other meatpackers. When a

firm exercises monopsony power, having market power in the downstream market results

in higher prices for firms downstream.[79] By colluding on supply in the downstream market,

Defendants' conduct had the dual effect of (1) artificially decreasing the price at which

Defendants purchased fed cattle; and (2) restricting the supply of Beef, thereby artificially

increasing its price to direct purchasers of Beef.

---

[79] "[W]hen a firm with some market power in the sale of its product acquires monopsony
power in the purchase of its inputs, the prices paid for those inputs decrease, but the
*marginal* cost of production rises, the monopsonist's output falls, and the price to its
customers actually increases." See Roger D. Blair and Jeffrey L. Harrison, *Antitrust
Policy and Monopsony*, 76 CORNELL L. REV. 297 (1991), at 305-6, *available at*
http://scholarship.law.cornell.edu/clr/vol76/iss2/1.

109.   Defendants' anticompetitive conduct had these effects, among others:

A.     Price competition in the Beef market has been restrained or eliminated;

B.     Prices for Beef sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States;

C.     Direct purchasers of Beef have been deprived of free and open competition; and

D.     Direct purchasers of Beef paid artificially inflated prices.

110.   The purpose of the Defendants and their co-conspirators' conduct was to raise, fix, or maintain the price of Beef above a competitive level. As a direct and foreseeable result, Plaintiff and class members paid supra-competitive prices for Beef during the Class Period.

111.   Because of these alleged violations of antitrust laws, Plaintiff and the class have sustained injury to their businesses or property, having paid higher prices for Beef than they would have paid absent Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

112.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.    THE DEFENDANTS ACTIVELY CONCEALED THE CONSPIRACY

### A.    Fraudulent Concealment

113.    Throughout the Class Period, the Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and the class.

114.    The combination and conspiracy alleged was fraudulently concealed by the Defendants using various means and methods, including but not limited to secret meetings, surreptitious communications between Defendants by telephone or in person meetings to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply-restraint communications on documents, and by communicating competitively sensitive data to one another.

115.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Beef is not exempt from antitrust regulation, and thus, before these recent events Plaintiff reasonably considered it to be a competitive industry. A reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' Beef prices before these recent events.

116.    Furthermore, the Defendants actively concealed their unlawful behavior from Plaintiff by, among other means, (i) communicating with each other by telephone about their purchases and slaughter volumes so that they would not have written evidence of sharing this information with a competitor, as well as relying on non-public forms of communication; (ii) offering false or pre-textual rationale for the low price of fed cattle; (iii) providing pre-textual justifications for their plant closures, slaughter reductions, and

withdrawal from the case cattle trade; (iv) explicitly and implicitly representing that the fed cattle bids and contract terms offered to Plaintiff by the Defendants were the product of honest competition and not a conspiracy; (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws; and (v) misrepresenting the nature of their agreements (and purported adherence to competitive safeguards) to government officials and to the public.

117.   As alleged above, the Defendants ostensibly provided valid justifications for plant closures, slaughter reductions, and withdrawal from the cash cattle trade. However, as the following examples indicate, such justifications were merely pre-textual.

### 1.    The Tyson Defendants

118.   As alleged above, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy.

119.   To facilitate the conspiracy, the Tyson Defendants routinely utilized public statements to conceal Defendants' unlawful activity. For example, the Tyson Defendants' used their SEC filings from 2015 to 2018 to declare they had "limited or no control" over the pricing and production of cattle, with price instead "determined by constantly changing market forces of supply and demand."[80] As for the factors that do influence the cost of cattle, the Tyson Defendants identified "weather patterns throughout the world, outbreaks of disease, the global level of supply inventories and demand for grains and other feed

---

[80]   Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K) at 6 (Sept. 30, 2017); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018).

ingredients, as well as agricultural and energy policies of domestic and foreign governments."[81] The Tyson Defendants further stated that they "ceased operations at our Denison, Iowa plant" to "better align our overall production capacity with current cattle supplies."[82] In addition, the Tyson Defendants claimed, "[t]he Beef segment earnings improved . . . due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."[83]

120.    These pre-textual statements were made to obscure the Tyson Defendants' role and participation in the conspiracy. Instead of disclosing that improved earnings were the result of supracompetitive profits from Defendants' unlawful conspiracy, the Tyson Defendants provided pre-textual, mundane business justifications such as "lower fed cattle costs" and "favorable market conditions."[84]

### 2.    The JBS Defendants

121.    As alleged above, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy.

122.    To facilitate the conspiracy, the JBS Defendants routinely utilized public statements to conceal Defendants' unlawful activity. For example, JBS executive, Andre

---

[81]  *Id.*

[82]  Tyson Foods, Inc., Annual Report (Form 10-K), at 56 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K), at 54, 68 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K), at 57, 72 (Sept. 30, 2017).

[83]  Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Oct. 1, 2016); *see also* Tyson Foods, Inc., Annual Report (Form 10-K), at 23 (Sept. 30, 2017) ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson Foods, Inc., Annual Report (Form 10-K), at 25 (Sept. 29, 2018) (same).

[84]  *Id.*

Nogueira, declared in November 2015 that "[c]attle price will go down [sic]" in the United States because "we are going to see more cattle available."[85] Similarly, JBS CEO, Wesley Mendonca Batista, stated in March 2016 that JBS would see "better margin[s]" due to an "increase in the herd in the U.S."[86] JBS executives continued to make such statements throughout 2016, 2017, and into 2018, as they regularly claimed that JBS's strong financial performance in the United States was a result of "more cattle available in the U.S.,"[87] "cattle price[s] . . . [being] back to the normal level,"[88] and "strong demand for beef."[89]

123.    These pre-textual public statements were made to obscure the JBS Defendants' role and participation in the conspiracy. Instead of disclosing that the "improvement in EBITDA margin"[90] was the result of supracompetitive profits from Defendants' unlawful conspiracy, the JBS Defendants provided pre-textual, mundane business justifications such as there being "more cattle available in the U.S." and cattle prices returning "back to the normal level."

### 3.    The Cargill Defendants

124.    As alleged above, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy.

125.    To facilitate the conspiracy, the Cargill Defendants routinely utilized public statements to conceal Defendants' unlawful activity. For example, Cargill used its 2017

---

[85]  JBS, Q3 2015 Earnings Call, Bloomberg Transcript (Nov. 12, 2015) at 11.
[86]  JBS, Q4 2015 Earnings Call, Bloomberg Transcript (Mar. 17, 2016) at 6.
[87]  JBS, Q2 2016 Earnings Call, Bloomberg Transcript (Aug. 11, 2016) at 6.
[88]  JBS, Q3 2016 Earnings Call, Bloomberg Transcript (Nov. 16, 2016) at 8.
[89]  JBS, Q2 2018 Earnings Call, Bloomberg Transcript (Aug. 15, 2018) at 5.
[90]  *Id.*

Annual Report to explain that "[r]enewed consumer demand for beef . . ." produced "favorable market conditions in North America."[91] The following year, Cargill proclaimed that its Animal and Nutrition & Protein segment's "strong performance" in 2018 was "fueled by rising domestic and export demand for North American beef."[92]

126.   These pre-textual public statements were made to obscure the Cargill Defendants' role and participation in the conspiracy. Instead of disclosing that their "strong performance" stemmed from the supracompetitive profits of Defendants' unlawful conspiracy, Cargill provided pre-textual, mundane business justifications such as "favorable market conditions" and "rising domestic and export demand."

### 4.   National Beef

127.   As pleaded above, Jefferies and Marfrig both owned a controlling share of National Beef for portions of the Class Period and shared a unity of corporate interest and operated as part of a single enterprise with National Beef during those periods.

128.   To facilitate the conspiracy, National Beef/Jefferies/Marfrig Defendants routinely utilized public statements to conceal Defendants' unlawful activity. On information and belief, National Beef was the original and knowing source of every pre-textual public statement ostensibly made by Jefferies and/or Marfrig to conceal Defendants' conspiracy. For example, Jefferies Financial Group stated in October 2015 that the anticipated expansion of the cow-herd "bodes well for [meatpacking industry]

---

[91]   Cargill, Inc., 2017 Annual Report       at 1,
https://www.cargill.com/doc/1432094802973/2017-annual-report.pdf.
[92]   Cargill, Inc., 2018 Annual Report at 3,
https://www.cargill.com/doc/1432124831909/2018-annual-report.pdf.

margins as it will lead to an increase in the number of fed cattle available for slaughter."[93] In October 2016, Jefferies Financial Group explained that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when justifying how "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle has fallen from $1.48 to $1.16."[94] Similar justifications were offered throughout 2017 and 2018, with Jefferies Financial Group stating, for example, that: "National Beef generated record results for [Last Twelve Months] on the back of a more balanced supply of cattle and robust end market demand";[95] "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016";[96] "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins";[97] and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."[98] These statements were made during Jefferies Financial Group Investor Day presentations in 2015,

---

[93]   Leucadia National Corporation (Jefferies Financial Group), 2015 Investor Day Presentation at 113 (Oct. 8, 2015).
[94]   Leucadia National Corporation (Jefferies Financial Group), 2016 Investor Meeting Presentation at 53 (Oct. 5, 2016).
[95]   Leucadia National Corporation (Jefferies Financial Group), 2017 Investor Meeting at 1 (Oct. 5, 2017).
[96]   *Id.* at 58.
[97]   Jefferies Financial Group, 2017 Annual Report (Form 10-K) at 26 (Feb. 28, 2018).
[98]   Jefferies Financial Group Inc, 2018 Investor Meeting at 61 (Oct. 4, 2018).

2016, and 2017 – events at which National Beef's CEO and President, Tim Klein was scheduled to speak on topics related to National Beef's performance.[99]

129.    Marfrig similarly continued to offer pre-textual justifications for the low prices stemming from the Defendants' anticompetitive agreement after it acquired a controlling stake in National Beef. For example, Marfrig reported in November 2018 that "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."[100] During a third quarter company earnings call in 2018, Marfrig executives reiterated this point by claiming that "the U.S. beef industry has delivered record results" because of "an ample supply of cattle" and "strong demand in both the domestic and international markets."[101] Although Marfrig revealed it attained "record results" and "better margins" while reducing cattle slaughter volumes, it suggested this was merely due to "fewer weeks in the third quarter 2018 compared to the third quarter 2017."[102] National Beef CEO, Timothy M. Klein – referred to as "CEO of [Marfrig's] North American Operations" by Marfrig CEO, Eduardo de Oliveira Miron – participated in this call.[103] Consistent with this, Marfrig announced in the

---

[99]   Press Release, *Leucadia to Host Investor Day on October 8, 2015*, Leucadia National Corporation (Jefferies Financial Group) (Sept. 1, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2016*, Leucadia National Corporation (Jefferies Financial Group) (Sep. 12, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2017*, Leucadia National Corporation (Jefferies Financial Group) (Sept. 13, 2017), http://www.leucadia.com/All/1/1113.

[100]  Marfrig Global Foods S.A., Earnings Release 3Q18 (Nov. 5, 2018) at 2.

[101]  Marfrig, Q3 2018 Earnings Call, Bloomberg Transcript (Nov. 6, 2018) at 5.

[102]  *Id*. at 3

[103]  *Id*. at 2.

fourth quarter of 2018 that it attained a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."[104]

130.    Jefferies and Marfrig made these pre-textual public statements on behalf of National Beef – which, as alleged above, was the original and knowing source of the pre-textual public statements – to obscure its role and participation in the conspiracy. Instead of disclosing that its "record results" and "better margins" stemmed from the supracompetitive profits resulting from Defendants' unlawful conspiracy, Jefferies and Marfrig provided pre-textual, mundane business justifications such as the "ample supply of cattle," "higher cattle availability," and "strong demand."

131.    During their participation in the conspiracy, the Defendants publicly claimed adherence with antitrust laws. Below is a non-exhaustive list of examples of such statements published by the Defendants' during the Class Period:

a.      Tyson's Code of Conduct states, "[w]e compete in the market with integrity and comply with competition laws . . . [w]e comply with the letter and spirit of competition laws (also referred to as "antitrust" laws) wherever we do business."

b.      JBS's 2014 Annual Report touts that JBS has clear policies "[t]o ensure ethical conduct and integrity in the management of its business," including a Manual of Ethical Conduct "that addresses issues related to violations,

---

[104] Marfrig Global Foods, Earnings Conference Call 4Q18 and 2018 Presentation (Feb. 28, 2018) at 8.

conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices, and other sensitive topics."

c.    Cargill emphasized in its 2015 Corporate Responsibility report that "[w]e obey the law. Obeying the law is the foundation on which our reputation and Guiding Principles are built . . . . We conduct our business with integrity We compete vigorously, but do so fairly and ethically. We . . . comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill maintained this commitment to obeying the law and vigorous competition in subsequent Corporate Responsibility reports as well.

d.    National Beef's former majority shareholder, Jefferies Financial Group (formerly Leucadia National Corporation) acknowledged in its 2014 Annual Report that National Beef was "subject to extensive government regulation," including by the USDA.

132.    Packing Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation. Had the public learned that Defendants conspired to lower supply and effectively fix prices, their conspiracy could not have continued for as long as it did. Accordingly, Plaintiff could not have learned of Defendants' anticompetitive conduct until recently when Witness 1 came forward with otherwise inaccessible information.

133.    The GAO Report in April 2018 did not reveal the Defendants' anticompetitive conduct. As noted, *supra*, the GAO had limited investigative authority and "did not obtain and review internal packer documents." Its report therefore explicitly did

not consider whether Defendants engaged in anticompetitive behavior of the kind complained herein. Plaintiff here has also not obtained or reviewed internal packer documents.

134.    Because of the Defendants' fraudulent concealment, Plaintiff and the Class had insufficient information concerning Defendants' misconduct on which to base a complaint and could not have discovered it through the exercise of due diligence until recently. Plaintiff has acted diligently in seeking to bring their claims promptly. Accordingly, the running of any statute of limitations has been tolled and suspended regarding any claims and rights of action that Plaintiff and the other class members have because of the unlawful combination and conspiracy alleged.

### B.    Continuing Violations

135.    As alleged herein, the Defendants' conspiracy lasted from at least January 1, 2015 and continues through the present.

136.    Each Meatpacking Defendant engaged in the conspiracy to fix and suppress the throughput of fed cattle, which led to higher Beef prices paid by Plaintiff and Direct Purchaser class members.

137.    Due to the anticompetitive conduct challenged in this Complaint, throughout the Class Period, the Defendants were able to and did sell Beef at artificially inflated prices.

138.    Plaintiff and Direct Purchaser class members purchased Beef for distribution at artificially inflated prices by the conduct challenged in this complaint.

139.    Thus, each Defendants' sale of boxed Beef at an artificial and non-competitive price constituted a new overt act resulting in injury to Plaintiff and the Direct Purchaser class.

140.    The Defendants' Beef sales pursuant to the conspiracy continued throughout the Class Period and, accordingly, Plaintiff and the Direct Purchaser class were injured and may recover for damages suffered at any point in the conspiracy.

141.    Defendants continue to engage in the anticompetitive conduct alleged herein, and continue to be able to and do sell Beef at artificially inflated prices.

142.    Furthermore, the Defendants' unlawful communications regarding pricing and procurement decisions continue to this day.

## IX.    CLASS ACTION ALLEGATIONS

143.    Plaintiff brings this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of the members of the following Plaintiff Class:

> All persons and entities who purchased Beef directly from any of the Defendants or their respective subsidiaries or affiliates for use or delivery in the United States from at least January 1, 2015 until the present. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

144.    **Class Identity**: The Plaintiff Class is readily identifiable and is one for which records exist.

145. **Numerosity**: Due to the nature of the trade and commerce involved, Plaintiff believes there are thousands of Class members, the exact number and their identities being known to Defendants and their co-conspirators.

146. **Typicality**: Plaintiff's claims are typical of the claims of the members of the Plaintiff Class because Plaintiff purchased Beef directly from one or more of the Defendants during the class period and have been injured in the same way, by paying more for Beef than they would have absent the conspiracy. Plaintiff's claims arise from the same common course of conduct and give rise to the same claims of injury as those of the Plaintiff Class and the relief sought is common to the Class.

147. **Common Questions Predominate**: There are questions of law and fact common to the Plaintiff Class, including, but not limited to:

A. Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Beef sold in interstate commerce in the United States;

B. The identity of the participants of the alleged conspiracy;

C. The duration of the conspiracy alleged and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

D. Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

E. Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of the Plaintiff and the other members of the class;

F. The effect of Defendants' alleged conspiracy on the price of Beef sold in the United States during the Class Period;

G. The appropriate class-wide measure of damages; and,

H.    Whether Plaintiff and other members of the class are entitled to injunctive relief, and the nature and extent of such injunctive relief.

These and other questions of law and fact, which are common to the members of the class, predominate over questions affecting only individual members of the Plaintiff Class.

148.   **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Plaintiff Class because Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Plaintiff Class. Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent them and the Plaintiff Class.

149.   **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual joinder of all class members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Plaintiff Class compared to the expense and burden of individual prosecution of the claims asserted means that, absent a class action, it would not be feasible for members of the Plaintiff Class to seek redress for the violations alleged. Further, individual litigation would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action will reduce case management difficulties and provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

150.    The prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

151.    Defendants have acted on grounds generally applicable to the Plaintiff Class, making final injunctive relief appropriate for the Plaintiff Class as a whole.

## X.    VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

152.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

153.    Beginning at least as early as 2015 and continuing through the present, the exact dates unknown to Plaintiff, Defendants and their co-conspirators entered into and engaged in a continuing agreement, understanding, and conspiracy in unreasonable restraint of trade to artificially fix, raise, and stabilize the wholesale price for Beef in the United States, creating anticompetitive effects, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

154.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

155.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

- Fixing, raising, and stabilizing the wholesale price of Beef; and

- Allocating among themselves and collusively reducing the production of Beef.

156.    The combination and conspiracy alleged has had these effects, among others:

- Price competition in the sale of Beef has been restrained, suppressed, and/or eliminated in the United States;

- Prices for Beef sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

- Plaintiff and members of the Class who directly purchased Beef from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators, have been deprived of the benefits of free and open competition in the purchase of Beef.

157.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Beef throughout the United States because Defendants sell their Beef throughout the country and in every state.

158.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Beef.

159.    Plaintiff and members of the class have been injured and will continue to be injured in their businesses and property by paying more for Beef purchased directly from the Defendants and their co-conspirators than they would have paid and will pay absent the combination and conspiracy.

160.    The alleged contract, combination, understanding, agreement, or conspiracy is a *per se* violation of the federal antitrust laws.

161.    Plaintiff and members of the class are entitled to an injunction against Defendants, preventing and restraining the violations alleged.

## XI.    REQUEST FOR RELIEF

Plaintiff requests:

A.    The Court determine that this action may be maintained as a class action under Rule 23 and Plaintiff may be named as representatives of the Class, and direct that notice of this action be given to the Class, once certified;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged, be adjudged violations of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.    That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

D.    That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.    That Defendants and their co-conspirators be enjoined from further violations of the antitrust laws; and

F.    That Plaintiff and members of the Class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.    JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated:   October 16, 2019                        Respectfully submitted,

*/s/ Daniel E. Gustafson*
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Joshua J. Rissman (#0391500)
Brittany N. Resch (#397656)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

Dennis J. Stewart (*pro hac vice forthcoming*)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dstewart@gustafsongluek.com

Joseph W. Cotchett (*pro hac vice forthcoming*)
Adam Zapala (*pro hac vice forthcoming*)
Elizabeth Castillo (*pro hac vice forthcoming*)
Tamarah Prevost (*pro hac vice forthcoming*)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
T: (650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com

ecastillo@cpmlegal.com
tprevost@cpmlegal.com

***Counsel to Pacific Agri-Products, Inc. and the
Putative Direct Purchaser Class***

Daniel J. Mogin
(*pro hac vice forthcoming*)
Jennifer M. Oliver
(*pro hac vice forthcoming*)
**MOGINRUBIN LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 687-6611
Facsimile: (619) 687-6610
dmogin@moginrubin.com
joliver@moginrubin.com

R. Alexander Saveri
(*pro hac vice forthcoming*)
Cadio Zirpoli (*pro hac vice forthcoming*)
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813
rick@saveri.com
cadio@saveri.com

Kevin Landau (*pro hac vice forthcoming*)
Evan Rosin (*pro hac vice forthcoming*)
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
klandau@tcllaw.com
erosin@tcllaw.com

Kenneth A. Wexler
(*pro hac vice forthcoming*)
Melinda J. Morales
(*pro hac vice forthcoming*)
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone:(312) 346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com

Simon B. Paris (*pro hac vice forthcoming*)
Patrick Howard
(*pro hac vice forthcoming*)
Charles J. Kocher
(*pro hac vice forthcoming*)
**SALTZ, MONGELUZZI, BARRETT
& BENDESKY, P.C**.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 496-8282
Facsimile: (215) 496-0999
sparis@smbb.com
phoward@smbb.com
ckocher@smbb.com

Brian D. Penny
(*pro hac vice forthcoming*)
**GOLDMAN SCARLATO & PENNY,
P.C.**
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Telephone.: (484) 342-0700
Facsimile: (484) 580-8747
penny@lawgsp.com

Dianne M. Nast
(*pro hac vice forthcoming*)
Daniel N. Gallucci
(*pro hac vice forthcoming*)
Joseph N. Roda
(*pro hac vice forthcoming*)
**NASTLAW LLC**
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Telephone: (215) 923-9300
dnast@nastlaw.com
dgallucci@nastlaw.com
jroda@nastlaw.com

J. Gordon Rudd, Jr. (#222082)
David M. Cialkowski (#306526)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
gordon.rudd@zimmreed.com
david.cialkowski@zimmreed.com

Joseph Goldberg
(*pro hac vice forthcoming*)
Vince Ward (*pro hac vice forthcoming*)
**FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD P.A.**
20 First Plaza, Suite 700
Albuquerque, NM  87102
Telephone: (505) 244-7520
jg@fbdlaw.com
vjw@fbdlaw.com

*Additional Counsel to the Putative Direct Purchaser Class*